Filed 1/22/14  P. v. Knowles CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ANTHONY GEORGE KNOWLES, Defendant and Appellant. | B243612 (Los Angeles County Super. Ct. No. GA072072) |

APPEAL from orders of the Superior Court of the County of Los Angeles, Janice Claire Croft and Leslie E. Brown, Judges. Affirmed.

Jonathan P. Milberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II, Supervising Deputy Attorney General, Alene M. Games, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury found defendant and appellant Anthony Knowles (defendant) guilty of, inter alia, second degree robbery and false imprisonment, and the trial court sentenced him to 103 years, four months, to life in prison. On appeal, defendant contends that the trial court abused its discretion when it relieved his appointed counsel of choice and instead appointed counsel from an indigent criminal defense panel. Defendant also contends that he received ineffective assistance of counsel because his trial counsel, after successfully excluding gang evidence, elicited answers from a witness during impeachment that "opened the door" to the prosecution's introduction of prejudicial gang evidence.

We hold that because the record does not affirmatively show that the trial court abused its discretion when it entered the order relieving defendant's appointed counsel of choice, we affirm that order. We further hold that counsel's apparent tactical choice to impeach a key prosecution witness with inconsistent statements did not constitute ineffective assistance of counsel. We therefore affirm the judgment of conviction.

# FACTUAL SUMMARY[1]

Stephen Norris (Norris), defendant's former codefendant, testified at trial that defendant and fellow Crips gang member, Tony Martin (Martin), planned and executed a late-night armed robbery of a Rite-Aid store while Norris served as the getaway driver. Store surveillance video and three female store employees, who were tied up during the robbery, confirmed that two armed robbers, one in a brown ski mask and the other in a

---

[1] Because defendant does not challenge on appeal the sufficiency of the evidence in support of his conviction, and instead raises challenges to a pretrial ruling and a tactical choice of his counsel during trial, we provide a brief summary of the facts adduced at trial to provide context for the ensuing analysis of the two issues raised on appeal.

black ski mask, committed the robbery; and defendant's DNA was found on a brown ski mask recovered from the abandoned getaway car.

## PROCEDURAL BACKGROUND

In an information, the Los Angeles County District Attorney charged defendant in counts 1 through 3 with second degree robbery in violation of Penal Code section 211[2]; in count 4 with second degree commercial burglary in violation of section 459; in counts 7, 8, and 10 with false imprisonment by violence in violation of section 236; and in count 9 with possession of a firearm by a felon in violation of (former section 12021(a)(1), repealed by Stats. 2012, ch. 711, § 4, now § 29800, operative Jan. 1, 2012). The District Attorney alleged that, as to counts 1, 2, and 3, defendant personally used a firearm within the meaning of section 12022.53, subdivision (b). The District Attorney further alleged that, as to counts 4, 8, and 10, defendant personally used a firearm within the meaning of section 1203.06, subdivision (a)(1) and section 12022, subdivision (a)(1). And the District Attorney alleged that, as to counts 1, 2, 3, 4, 7, 8, 9, and 10, defendant had suffered four prior convictions of serious or violent felonies within the meaning of sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i), as well as two prior convictions of serious felonies within the meaning of section 667, subdivision (a)(1). Defendant pleaded not guilty and denied the allegations.

Following trial, the jury found defendant guilty on all counts and found the weapon allegations true. In a subsequent proceeding, the trial court found the prior conviction allegations true. The trial court sentenced defendant to an aggregate prison term of 103 years, four months, to life.

---

[2] All further statutory citations are to the Penal Code, unless otherwise indicated.

3

**DISCUSSION**

### A.      Order Relieving Appointed Counsel of Defendant's Choice

#### 1.      Background

Defendant's brother retained a private attorney, Ronald Kaye, to represent defendant through the preliminary hearing.  Following the preliminary hearing, defendant filed a motion for an order appointing attorney Kaye as trial counsel pursuant to section 987.2[3] and *Harris v. Superior Court* (1977) 19 Cal.3d 786.  According to the declaration of attorney Kaye, defendant was indigent and his family members were no longer able to hire private counsel for defendant.  Attorney Kaye explained that because he had represented defendant through the preliminary hearing, he had "extensive knowledge" of the facts of this case, including the police reports, the witness statements, the DNA analysis, the uncharged cases purportedly showing modus operandi, and the cellular

---

[3]      Section 987.2 provides, in pertinent part, "(a)  In any case in which a person, including a person who is a minor, desires but is unable to employ counsel, and in which counsel is assigned in the superior court to represent the person in a criminal trial, proceeding, or appeal, the following assigned counsel shall receive a reasonable sum for compensation and for necessary expenses, the amount of which shall be determined by the court, to be paid out of the general fund of the county:  [¶] . . .[¶]  "(d)  [T]he court shall first utilize the services of the public defender to provide criminal defense services for indigent defendants.  In the event that the public defender is unavailable and the county and the courts have contracted with one or more responsible attorneys or with a panel of attorneys to provide criminal defense services for indigent defendants, the court shall utilize the services of the county-contracted attorneys prior to assigning any other private counsel.  Nothing in this subdivision shall be construed to require the appointment of counsel in any case in which the counsel has a conflict of interest.  In the interest of justice, a court may depart from that portion of the procedure requiring appointment of a county-contracted attorney after making a finding of good cause and stating the reasons therefor on the record."

phone analysis. Attorney Kaye also provided a summary of his experience as a criminal law practitioner, including his experience as a deputy federal public defender. Attorney Kaye related that defendant had requested him to "remain as counsel of record if at all possible," and confirmed that he was willing to accept appointment as defendant's counsel if an acceptable rate of compensation could be agreed upon.

At the arraignment hearing on October 8, 2008, the trial court granted defendant's motion to appoint attorney Kaye as his trial counsel. At the October 28, 2008, pretrial conference, however, the trial court, without explanation, relieved attorney Kaye and appointed "bar panel" attorney Chris Chaney to represent defendant. The reporter's transcript for October 28, 2008, proceeding does not reflect the trial court's discussion regarding its order or its order relieving attorney Kaye, which order is reflected in the minute order for that proceeding as follows: "Private counsel relieved this date. Bar panel [counsel] appointed." The matter proceeded to trial following which, as noted, the jury found defendant guilty as charged.

In support of his motion for new trial, defendant attached a declaration of attorney Kaye that provided the following information concerning his appointment as defendant's counsel and his subsequent withdrawal from that representation. "3. After the preliminary hearing I was advised by [defendant's] family that they could no longer afford to retain me to represent him in the Superior Court. Consequently, I made a decision to move the Superior Court to appoint me as indigent defense counsel, paid by the Court. The Court in Department H granted that motion on October 8, 20[08]. [¶] 4. On October 28, 2008, I appeared in Department H for a pretrial status conference. On October 24, 2008, based on the Court's October 8, 2008 order appointing me to represent [defendant], I filed several under seal documents with the Court requesting funds for my representation, both setting out my proposed billing rate for my representation for a three strikes case and for hiring experts. At that pretrial status conference the Court advised me that it had spoken with representatives of the Los Angeles Superior Court in downtown Los Angeles, and that *the policy of the court was that indigent defendants had to be represented by the Indigent Criminal Defense Panel of the Los Angeles County Bar*

5

*Association.*  Consequently, I was ordered by the Court that I could no longer represent [defendant] as appointed counsel.  After receiving this order from the Court, I advised [defendant] and his family, and did no further legal work on his case."  (Italics added.)  Following a hearing on the new trial motion, the trial court denied the motion, including that portion of the motion seeking a new trial based on the trial court's order relieving attorney Kaye as trial counsel.

### 2. Analysis

Defendant contends that the trial court abused its discretion when it relieved attorney Kaye after appointing him and instead appointed counsel from the Los Angeles County Bar Association's indigent criminal defense panel.  According to defendant, because the trial court had determined under section 987.2, subdivision (d), that there was good cause to appoint private attorney Kaye, relieving him based on the policy of the Superior Court was unreasonable and an abuse of discretion.

"[I]t is the function of the [trial] court, in the exercise of its sound discretion, to appoint counsel for an indigent defendant.  This discretion . . . may not be limited or narrowed by the defendant's expression of preference for a particular attorney . . . .  The matter . . . 'rests, as always, in the sound discretion of the trial court . . . .'  [Citation.]"  (*Harris v. Superior Court, supra,* 19 Cal.3d at p. 795, 799 [trial court abused its discretion when considerations in support of appointment "heavily outweighed" contrary factors, such that "only one conclusion [was] possible"].)  Even when a defendant has a preexisting relationship with an attorney willing to accept appointment, the trial court need not appoint that attorney when there are sufficient countervailing factors.  (*People v. Sapp* (2003) 31 Cal.4th 240, 256.)  To establish an abuse of discretion, defendant has the burden on appeal of showing that the trial court's decision to relieve attorney Kaye and replace him with panel counsel was arbitrary, capricious, or patently absurd.  "'The abuse of discretion standard . . . reflects the trial court's superior ability to consider and weigh the myriad factors that are relevant to the decision at hand.  A trial court will not be found to have abused its discretion unless it  "exercised its discretion in an arbitrary, capricious,

or patently absurd manner that results in a manifest miscarriage of justice.'"  [Citation.]" (*People v. Lancaster* (2007) 41 Cal.4th 50, 71.)

Because the trial court's order relieving attorney Kaye is presumed correct, including as to matters on which the record is silent, it is defendant's burden on appeal to provide an adequate record that allows us to analyze his abuse of discretion claim.  (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 ["[I]t is settled that:  'A judgment or order of the lower court is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error'"]; *Maria P. v. Riles* (1987) 43 Cal.3d 1281,1295 [It is appellant's burden to provide an adequate record to assess error].)

Here, there is no reporter's transcript that reflects the trial court's decision to relieve attorney Kaye, and thus no transcript that reflects the trial court's reasoning. Therefore we do not know, for example, if counsel discussed his proposed compensation with the trial court.  Because the record is silent as to the trial court's reasoning, we must presume that the trial court acted within its discretion in relieving attorney Kaye.

Moreover, even assuming that the after-the-fact declaration of attorney Kaye in support of the new trial motion is a reliable record of the trial court's reasoning, the declaration as to that issue is, at best, conclusory.  According to the declaration, the trial court did not specify the source of any rule or policy or its precise nature.  There is nothing in that declaration to show that the policy upon which the trial court purportedly relied in relieving attorney Kaye and appointing panel counsel was irrational or arbitrary. Thus, we must presume that the court policy referenced in the declaration had a rational basis, such that it was not arbitrary, capricious, or patently absurd for the trial court to rely on that policy in making its decision to relieve attorney Kaye.  Following a rule or policy would not be arbitrary or irrational.  Because the record on appeal does not affirmatively show an abuse of discretion, we must affirm the order relieving defendant's counsel of choice.

7

## B. Ineffective Assistance of Counsel

### 1. Background

Prior to trial, defendant's trial counsel filed a motion in limine to exclude evidence of defendant's gang membership. At the hearing on the motion, defendant's counsel explained that he was concerned that codefendant Martin and former codefendant Norris might testify that the reason they participated in the robbery was because they feared defendant who had a reputation as a gang member. In response, the prosecutor assured the trial court that she did not anticipate introducing gang evidence. Defendant's counsel accepted the prosecutor's assurance and received permission from the trial court to make an Evidence Code section 402 motion prior to Norris's testimony if necessary to "determine . . . whether or not [the prosecutor] would be attempting to elicit gang testimony."

Prior to Norris's testimony, the prosecutor, with the trial court's consent, admonished Norris, inter alia, "not to make any reference to any gang membership." During her direct examination of Norris, the prosecutor did not attempt to elicit any gang evidence, and Norris did not make any reference to defendant's gang membership. During cross-examination, however, defendant's counsel elicited the following testimony from Norris: "Q. And that's when you told us earlier on direct examination that you hung out at your house for a couple of hours. A. Yes. Q. Did you tell the police that after you dropped Johnny Cole off, you went back to your house, packed some stuff and had Tony drop you off at your girlfriend's house.? A. At first I did, yes. Q. And did you tell the police officers who was at your house? A. Yes, I did. Q. Did you tell them that Tony Cole was there? A. Johnny Cole, yes. Q. Excuse me, okay. Johnny Cole. And did you tell them that Mr. Martin was there? A. Yes. Q. Did you tell them that Danny Johnson was there? A. Yes. Q. And they ask you if that was all the people that were there at the house, correct? A. To tell you the truth, I don't remember, I think I did mention that [defendant] was there. I'm not for sure. Q. Well, at this point in time of the interview, they were asking you questions and they asked you who was there. And the

answer was that there was four people. A Tony Cole. According to this, a Tony Martin and Danny Johnson? A. Yes. Q. You told them you were watching the game. A. Yes. Q. You believe you told them that [defendant] was there at the time? A. Yes. I didn't refer to him as [defendant]. I referred to him as Bones."

Immediately after Norris referred to defendant as Bones, the following sidebar proceeding took place. "[Prosecutor]: Your Honor, I'm—the portion, the transcript [to] which [defense counsel] was referring . . . , I'll submit the gang references in which he asked to keep out. . . . This line of questioning may lead to some of the very gang references that counsel is seeking to keep out. Specifically, the reason as to why Mr. Norris did not initially state it was [defendant] and that has to do with some of the gang connotations and his position within the gang. [¶] The Court: [Defense counsel] do you want to be heard? [Defense Counsel]: Well, I don't understand that, but he talked to the police. They asked him who was there, he gave them the names and so he asked them, that's four of you altogether and he says, yes. So at first all he did was talk about other people and they were putting [defendant] in there and if the court recalls, I ask[ed] that earlier question about who was in the house at the time and he said the only person there was—there was only Mr. Martin there for a period of time. [¶] The Court: Okay. But I think your point, [prosecutor] is, is given the line of questioning, that [the prosecutor is] going to be inclined to ask him why he made certain responses and that they may cause him to respond, I'm assuming this is what she's saying, about this gang reference and that's basically what I hear her saying, that it may be inviting that response by going down this line. [¶] Now, I don't—clearly don't know. I haven't seen the transcript. I don't know anything about it, but what I will say is that it logically, your line of questioning leads to that area that I'm not going to be able to stop [the prosecutor] from asking questions to clarify his answers. [¶] So you do so at your peril. I'm not necessarily saying you have to, but what she's saying is you're headed in that direction. I'm not making any ruling now, but I'm just suggesting you might take that into consideration. [¶] [Defense Counsel]: Okay. I appreciate that."

9

Cross-examination resumed, during which defendant's counsel elicited the following responses from Norris. "Q. Is that when you then started telling the officers that you were driving the vehicle? A. Yes. Q. And that was your sole role was to drive the vehicle? A. Yes, sir. Q. Did you ever tell the officers that you got involved in this, because you thought that [defendant] and Mr. Martin were gang bangers? A. Did I say that's the reason why I got involved? Q. Yeah. A. I don't know if I said that's the reason why I got involved. Q. Once you started to tell the story and started putting yourself into this robbery as a driver, did you tell them that you didn't want to be involved, but you were afraid of them? A. Something to that effect. Q. And it was that excuse you gave for, or the reason that you gave for reluctantly getting involved in this robbery? A. Yes. Q. Now, just an aside, when you were here in court on direct examination, you answered questions for the District Attorney and you told this jury that you got involved for other reasons."

Before Norris answered the last question, the prosecutor requested another sidebar conference, during which the following exchange took place. "[Prosecutor]: Your Honor, the court ruled specifically not to make any gang references. Based on that, the witness made his response and did not pursue the additional reasons in which he got involved. Counsel just alluded to the fact that gang bangers in this line of questioning. [The] People [were] clear on the court ruling and ask the court to admonish on the record. So that the witness is clear on the court ruling. It appears that defense counsel is not. [¶] The Court: Counsel, it does create a problem in which you make an argument to exclude certain testimony. [¶] [Defense Counsel]: Right. [¶] The Court: And then you in turn are the one who brings out the testimony. The witness is instructed to not go in that area. I think it's kind of, you put him in a bind, so to speak. [¶] [Defense Counsel]: I can see that and I can see that as raised. I just made the decision based upon our last sidebar, that I believe that there was a possibility that the court was going to allow testimony to come in. So although the court previously ruled that we could keep it out, I opened the door to it purposely, but the reason I have a problem with this is that you he told us on direct examination, that the reason he got involved is because he wanted to participate and share

10

in the profits basically, and so when we made that ruling, we weren't asking him to lie and come up with a different story. [¶] The Court: Right. Okay. Let me handle it this way. Clearly the door is open. You can ask anything you want about that. You can also ask if any of his answers on his cross examination were influenced by him having been told beforehand that he wasn't supposed to make reference to gang reference. You don't have to ask that, but I think based where we are, I'm going to allow that leeway because we did specifically admonish him that he's not to talk about gang information. The door is open, you guys will do what you want with it. You can do what you want with the information. [¶] [Prosecutor]: I understand, your Honor. . . . I understand counsel's strategy in opening the door, but it opened the door to the gang allegation and also the relationship between Mr. Martin and [defendant] being gang members who committed a robbery together previously. [¶] The Court: You can inquire [about] that too. [¶] [Defense Counsel]: First of all, I think the court needs to have additional information. What happened when this particular individual was interviewed, the story he gave to the police was that he didn't want to get involved and he did reluctantly, because he was afraid of them, he made—he gave a different story, which was that [defendant] owed him some money. And he thought this was the only way he can get his money back and when he came to court today, he didn't go with that story. He came up with this third story that he clearly wanted to get involved. I would say I don't see how that in any way opens up the door to this relationship back years ago, these people hadn't seen each other, been with each other, until this recent period of time. So that's the part—that's the reason I was getting into what he told this jury in court today, is because he had given two different versions before. [¶] [Prosecutor]: And your Honor, I'm just not sure how the fact that there's gang affiliations, between all three of these individuals, specifically, between Mr. Martin and [defendant], how that can develop exactly what he said without and still within the court's ruling of excluding the gang reference. [¶] The Court: What are you asking the court at this point? [¶] [Prosecutor]: Your Honor, I'm just saying, that given the court ruling, the court is—I'm not asking the court for anything. As the court indicated, I would be allowed to go into that area and make reference to why the

11

defendant previously did not state that. [¶] [Defense Counsel]: Maybe I can make the suggestion, because it may change over the course of my cross examination, but maybe we should revisit this issue at the close of my cross and before redirect to see what doors I've opened. Is that okay with the court? [¶] The Court: We can, but I'm going to say preliminarily that I think the door has been swung wide open. But we can address that."

On redirect examination, the prosecutor elicited the following gang-related testimony from Norris. "Q. Now, you were asked a question on cross examination regarding gang bangers. Do you recall that? A. Yes. Q. You stated you knew the defendant by another name? A. Yes. Q. And what name is that? A. Bone. Q. And did you know whether or not Mr. – whether the defendant had any gang affiliation? A. Yes. Q. And what gang was that? A. Raymond Crips. Q. And Mr. Martin, your friend of almost 30 years, do you know whether or not he had any gang affiliation? A. Yes. Q. And what was that? A. The same. Same gang. Q. The Raymond Crips? A. Yes. Q. When you were asked to be the get-away driver, did the fact that Mr. Martin and the defendant belong to the Raymond Crips, did that play any role in your participation in the robbery? A. Somewhat. Q. Can you explain to the jury what you mean by that? A. I guess if, that's how I knew them from that, you know that they were from that gang. As far as that's concerned, so - -."

Following that testimony by Norris, defendant's counsel requested a sidebar conference. Following a lengthy exchange with counsel, the trial court ruled as follows: "The Court: I'm going to allow the people to go along the lines that she indicated. I disagree with your characterization of this, [defense counsel], I think that—I don't know. Using the door analogy, I think this is an instance, where it was opened and I don't think you can reclose it at this point. . . . Your side of the case put this out there and for you to want to control the use of it at this point, is unruly. You created unruly situations in regards to this. And I don't think that justice would require that I preclude them. [¶] It's not as if what he's testifying to now is not truthful, but you're not the one that put in the arena of relevance. That's the problem with this. Okay. Because otherwise, nothing that I'm hearing here is not now relevant. [¶] Now, put into question whether this gentleman

12

was intimidated or in any way influenced by this gang issue, and I don't think that it's fair to say, no, you can't bring that out, I think the remedy now is the arguments that you two make. That's all I can say. At this point, the people are allowed to put this on. And I think that it's in large part based upon the fact that you made a decision to bring it up. And that you had previously asked that it not. [¶] See, the problem that you're arguing about is substantially of your creation, because of the motion to exclude the evidence. You didn't cause the witness to testify the way that he did, but if you stuck with the ruling, that you asked the court to make, we wouldn't have any of this problem, but you made the decision to do so and this is the result of it. And that's why I'm ruling the way I am at this point."

Redirect examination continued, during which the prosecutor elicited further gang-related testimony from Norris. "Q. Mr. Norris, during the time that you spoke with Detective Wilken, did the issue of Mr. Martin and [defendant] being in the Raymond Crips gang come up during that conversation? A. Yes. Q. And do you recall telling the officer and Detective Wilken and his partner that you didn't want to get caught up, because of what Mr. Martin and [defendant] do? A. Yes. Something to that effect. Q. And what were you referring to? A. Basically their gang affiliation or whatever. Q. Did you tell Detective Wilken that [defendant] and Mr. Martin had friends? A. Yes. Q. Did you tell the detective you didn't want to. That they had friends that were gang bangers? A. Yes. Q. Did you ask the detective whether or not you would have to testify—you would have to testify. Any particular reason why you asked Detective Wilken why you would have to testify in this case. A. Yes. Because I know that there would be complications for me testifying or whatever. Q. Could you explain to the jury what you mean by complications? A. I mean there would be people that wouldn't like me to come to court and testify. I didn't know what would happen for them to prevent me from testifying. Q. When you say there would be people to prevent you from testifying, would these people be associated with Mr. Martin and the defendant? A. Yes. Q. Which one, sir? A. Pardon me? Q. Which one? Mr. Martin or the defendant? A. The defendant. Q. Now, the complications that you're talking about, were you aware of

those complications or the possibility of those complications when you were talking with Detective Wilken? A. Yes. Q. Did that play any role whatsoever in what you were telling Detective Wilken? A. Yes. Q. How so? A. Well, at first I didn't implicate the defendant, because of that fact—that's why I left him out the first time they asked me who was at the house. Q. Because of his association with the Raymond Crimes [*sic*]? A. Yes. Q. Your friend, Mr. Martin, was in Raymond Crips as well, right? A. Yes. Q. If I ask you whether or not Mr. Martin was active in the Raymond Crips, do you know what I mean by that? A. Yes, I do. Q. And was he? A. No, he wasn't at that time. Q. And when I say—let me ask you. Was Mr. Martin—I'm sorry. The defendant, was he active in the Raymond Crips? A. As far as I know, yes. Q. Now, could you explain to the jury, what do you mean by 'active?' When you say 'active,' what do you mean by that in relation to the Raymond Crips gang? A. 'Active' means that he hangs out with them. You know, he lives, he lived in the same city as they did. So yeah, he was affiliated with them. He was around them. Q. Would you say, you had a certain attitude or respect toward the defendant because of that association? A. Yeah. I would say so, yes. Q. Is that affecting your testimony today? A. Is that affecting my testimony? Q. That's right, sir. A. Not really. No." "Q. Did the detectives—when you were talking with detectives during their interview, you mentioned yesterday that you knew Mr. Martin and [defendant] to be associated with the Raymond Crips gang? A. Yes. Q. And did you—were you asked whether or not you were a gang member? A. Yes. Q. And what did you tell the detectives? A. I told them I wasn't. Q. Do you know how long Mr. Martin and [defendant]—or [defendant] have been associated with the Raymond Crips gang? A. No, I don't know exactly how long, no. Q. Do you know how long Mr. Martin had been associated with the gang? A. I would say over 20 years. Q. Did you tell officers that—well, you indicated yesterday that you knew Mr. Martin and [defendant] as gang members, right? A. Yes, I did. Q. Did you think that Mr. Martin— did you have any fear of Mr. Martin at the time of this robbery? A. No, I didn't. Q. Did you have any fear of [defendant] at the time of this robbery? A. Not particularly them themselves but who they were associated with."

14

During closing arguments, both the prosecutor and defense counsel made reference to the gang testimony. The prosecutor argued that despite Norris's knowledge that defendant and Martin were gang members, he willingly participated in the robbery with them. Defendants' counsel argued that Norris's statement about being afraid of defendant and Martin because they were gang members was not credible, given his other inconsistent statements about why he participated in the robbery.

### 2. *Applicable Legal Principles*

"'To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."'" (*People v. Kipp* (1998) 18 Cal.4th 349, 366 [75 Cal.Rptr.2d 716, 956 P.2d 1169], quoting *Strickland v. Washington* [(1984)] 466 U.S. [668,] 686.) Preliminarily, we note that rarely will an appellate record establish ineffective assistance of counsel. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267-268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].)" (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) "We have repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' (*People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212] quoting *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. (*People v. Wilson*, *supra*, at p. 936; *People v. Pope*, *supra*, at p. 426.)" (*People v. Mendoza Tello, supra,* 15 Cal.4th at pp. 266-267.)

The burden is on defendant "to demonstrate by a preponderance of the evidence that counsel's performance was inadequate and fell below an objective standard of

reasonableness (*In re Gay* (1998) 19 Cal.4th 771, 790 [80 Cal.Rptr.2d 765, 968 P.2d 476]), i.e., that [defendant] was deprived of 'reasonably effective assistance' (*Strickland*, *supra*, 466 U.S. at p. 687; accord, *People v. Wade* (1988) 44 Cal.3d 975, 989 [244 Cal.Rptr. 905, 750 P.2d 794]).  We assess the reasonableness of counsel's performance deferentially.  (*Strickland*, at p. 689; *People v. Mincey* (1992) 2 Cal.4th 408, 449 [6 Cal.Rptr.2d 822, 827 P.2d 388].)  We consider counsel's performance from his perspective, analyzing counsel's decisions based on what he knew or should have known at the time.  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1243-1244 [275 Cal.Rptr. 729, 800 P.2d 1159]; *In re Andrews* (2002) 28 Cal.4th 1234, 1253 [124 Cal.Rptr.2d 473, 52 P.3d 656].)  [¶]  The reasonableness of counsel's performance is assessed according to the prevailing norms at the time.  The United States Supreme Court has 'declined to articulate specific guidelines for appropriate attorney conduct and instead ha[s] emphasized that "the proper measure of attorney performance remains simply reasonableness under prevailing professional norms."'  (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 [156 L.Ed.2d 471, 123 S.Ct. 2527]; accord, *Rompilla v. Beard* (2005) 545 U.S. 374, 380 [162 L.Ed.2d 360, 125 S. Ct. 2456, 2462].)  [¶]  In evaluating counsel's performance, we assess both the reasonableness of counsel's decisions and the reasonableness of the investigation that underlay each decision.  . . .  '"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; . . . ."'"  (*In re Thomas* (2006) 37 Cal.4th 1249, 1257-1258.)

"'"'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel (see *People v. Wright* (1990) 52 Cal.3d 367, 412 [276 Cal.Rptr. 731, 802 P.2d 221]), and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 [48 Cal.Rptr.2d 525, 907 P.2d 373], quoting *Strickland v. Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 104 S.Ct. 2052].)  "[W]e accord great deference to counsel's tactical decisions" ( *People v. Frye* (1998) 18 Cal.4th 894, 979 [77 Cal.Rptr.2d 25, 959 P.2d 183]), and we have explained that "courts

should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" ( *People v. Scott* (1997) 15 Cal.4th 1188, 1212 [65 Cal.Rptr.2d 240, 939 P.2d 354]). "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

3.      *Analysis*

In this case, the record shows that defense counsel was faced with a difficult tactical decision during his cross-examination of Norris because the reason Norris gave at trial for participating in the robbery was different than the reason he had previously given investigators—i.e., he participated out of fear of defendant's gang membership. Norris was a key prosecution witness who participated in the robbery and identified defendant as one of the armed robbers. His credibility was therefore a crucial issue for the jury. Thus, it was not unreasonable under professional norms for defense counsel to conclude that impeaching Norris with his prior inconsistent statements to police was necessary to further undermine Norris's credibility. That the impeachment would involve eliciting information about defendant's gang membership did not, by itself, make defense counsel's tactical choice unreasonable. The record supports an inference that defense counsel was aware of the risk involved in impeaching Norris with his prior statements about defendant's gang membership and that he rationally balanced that risk against the benefit to be derived from impeaching Norris and arguing to the jury that he was an unreliable witness.

Given the strong presumption that defense counsel's choice fell within a wide range of reasonable professional assistance, we must defer on this record to defense counsel's difficult choice in this instance and cannot second guess that choice in the harsh light of hindsight. When all the circumstances surrounding defense counsel's tactical choice are viewed from his perspective, and in the context of the available facts, that tactical choice does not, on this record, appear to fall below prevailing professional

17

norms, such that we can conclude on direct appeal that there was ineffective assistance of counsel.

## DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


MOSK, J.


We concur:


TURNER, P. J.


KRIEGLER, J.

18